Michael **COPENHAVER**, et al.,
Appellants–Defendants,

v.

Steve **LISTER** d/b/a Lister Well
Drilling, Appellee–Plaintiff.

No. 54A04–0512–CV–715.

Court of Appeals of Indiana.

Aug. 11, 2006.

Jason W. Bennett, James A. Gothard, Bennett Boehning & Clary, Lafayette, IN, Attorneys for Appellants.

S. Bryan Donaldson, Crawfordsville, IN, Attorney for Appellee.

## OPINION

BAKER, Judge.

This appeal arises from a dispute between Steve Lister and Michael Copenhaver, two well-drillers, whose business relationship dissolved in late 2001. Appellants-defendants Michael and Paula Copenhaver (collectively, the Copenhavers) appeal the judgment entered in favor of appellee-plaintiff Steve Lister, d/b/a Lister Well Drilling (Lister), regarding his claim against them for replevin of certain business assets and conversion. Specifically, the Copenhavers contend that the trial court's judgment cannot stand because the finding that no partnership existed between the parties was based upon "mutually contradictory" evidence in the record. Appellant's Br. p. 1. Thus, the Copenhavers allege that they are entitled to a new trial.

Lister also cross-appeals, claiming that the appeal should be dismissed because the Copenhavers failed to timely file their Notice of Appeal. Concluding that this appeal is properly before us, and finding that the trial court did not err in concluding that no partnership existed between Lister and Copenhaver, we affirm the judgment of the trial court.

## FACTS

In early 1999, Lister and Gary Norris formed "The Water Boys," a partnership that was involved in the business of well drilling. Towards the end of that year, they executed a written partnership agreement. Lister was also acquainted with another well driller in the area, Dave Hopkins. Hopkins was Copenhaver's uncle who operated his business under the name of "Miracle Well Drilling, Inc."

Sometime around June 2000, Hopkins introduced Copenhaver to both members of The Water Boys partnership, and the four men began to discuss how to work together so that they might expand their Anderson-area business into west-central Indiana, where Copenhaver resided at the time. Although a formal agreement was not reached, Copenhaver began working with the Water Boys, who then assumed the business name of "Lister Well Drilling." The evidence showed that while Copenhaver's initial work with the Water Boys was to assist Norris on pump-service and well-drilling jobs, his primary responsibility was to rebuild and make operational a 1966–model Franks drilling rig that the Water Boys had recently purchased. As Copenhaver lived in the Crawfordsville area and the Franks rig was located in Anderson, Lister and Norris "paid a lot of his expenses" during that time "[b]ecause of the distance he was driving" regularly to work on the rig. Tr. p. 25. After the Water Boys disbanded in October 2000, Lister took some equipment, including the drill rig, a truck, and a trailer. Norris also took some of the equipment, including one of the other drill rigs, a water truck, and an air compressor.

Following the breakup, Lister placed approximately $20,000 into the Water Boys' account to pay the company's outstanding expenses. Lister continued paying Copenhaver's expenses, and Copenhaver contin-

ued working on the rig that he ultimately completed in early October 2000. Throughout this period, Copenhaver believed that a partnership agreement was in effect when he started working with Lister and Norris.

While working with Lister on an as-needed basis, Copenhaver was paid a fixed amount each week beginning September 14, 2001, and every week thereafter until January 4, 2002. Copenhaver was paid from the Lister Well Drilling account.

In September 2001, Lister advanced a proposal to Copenhaver concerning a possible partnership between the two of them that Copenhaver did not accept. However, at some point, Copenhaver apparently told Lister that the partnership proposal sounded good, but there was never any finalization of any suggested agreement. To be sure, no written agreement was ever prepared or executed, and there was no transfer of titles of vehicles or equipment into a partnership account that involved Copenhaver. Additionally, there was no apparent change in the manner in which the parties conducted their business affairs, and no partnership tax returns were prepared by the Copenhavers or Lister in 2001 or 2002. Copenhaver's individual personal tax return in 2000 did not make any mention of a partnership with either Lister or Norris. Similarly, Paula Copenhaver's individual personal tax return for the tax year 2000 did not mention any partnership between her husband and Lister or Norris.

Copenhaver maintained that had the Water Boys partnership continued to exist, he would have been responsible for operating the Franks rig in his area of the State and would have been able to retain 50% of the profits that the rig generated. Copenhaver also asserted that the remaining 50% of the profits would have been shared equally between Lister and Norris. The

evidence also showed that while the Water Boys partnership was still active, their vehicle signage, telephone-directory, advertisements, and flyers listed names and phone numbers for both Lister and Copenhaver. In essence, Copenhaver believed that the alleged profit-sharing agreement between himself and Lister survived the Water Boys split.

Copenhaver also urged that a partnership existed because Lister, on occasion, referred to Copenhaver as his partner or ex-partner—once in the course of making an insurance claim concerning the Franks rig, and again to a State Conservation Officer who investigated a complaint against Lister. Also, two of the checks issued to Copenhaver early in his tenure were notated as a "draw." Pl.Ex. 19.

On the other hand, Lister maintained that there was no discussion of making Copenhaver a partner during the brief negotiations between the Water Boys and Miracle Well Drilling. Lister asserted that Copenhaver worked with the Water Boys in the sole capacity as a subcontractor for whatever work might be available. Lister also insisted that after the Water Boys dissolved, he operated Lister Well Drilling as a sole proprietorship, with Copenhaver merely making persistent requests to become a partner. Accordingly, Lister believed that the payments he made to Copenhaver from June 2000 to April 2001 were full and final compensation for all of Copenhaver's work during that time, that the payments to Copenhaver from April to September 2001 were directly tied to the amount of work that Copenhaver had personally performed, and that the $900 weekly "draws" to Copenhaver beginning in September 2001 were only on "a trial basis pertaining to going into a partnership" in the future, and not reflective of a partnership having begun at that time. Tr. p. 43.

The record also shows that prior to April 2001, Lister's wife, Melanie, maintained the Lister Well Drilling accounts and financial records, holding the account in her own name because Lister had experienced some legal issues that prohibited him from holding accounts in his name. After the Listers separated in April 2001, Lister brought the books of the business to Copenhaver's wife so that she could resume management of the business finances. After several weeks of using her personal checking account for that purpose, Mrs. Copenhaver opened a separate checking account for the business under her name and Social Security number, with the Copenhavers and Lister authorized to sign on the account.

Sometime during the fall of 2001, Lister became seriously ill and underwent surgery. As a result, he was barely able to work for the remainder of the year. At that time, Copenhaver ran the business. By the time Lister was able to return to work in late 2001 or early 2002, he became concerned about withdrawals from the company's bank accounts and cash payments made by clients to the Copenhavers that had not been credited to the business account. As a result, Lister was convinced that Copenhaver was stealing from him and attempting to take over the business.

In January 2002, the Copenhavers refused to return certain business equipment to Lister after Lister demanded that they do so. Copenhaver also refused to reimburse the business $28,000 in missing funds. As a result, Lister filed an action in replevin against the Copenhavers for the return of "the well drilling equipment and bank accounts." Appellant's App. p. 40. Lister also sought injunctive relief against the Copenhavers to enjoin them from continuing to use his name, property, and advertising. Finally, Lister made a claim against the Copenhavers for conver-

sion, fraud, breach of fiduciary duty, and intentional interference with business relations.

In a counterclaim, the Copenhavers alleged that during the time that the partnership allegedly existed, Lister collected large sums of money but failed to pay those monies into the partnership in violation of the agreement. As a result, the Copenhavers requested a declaratory judgment as to the existence of a partnership between the parties. They also sought a money judgment against Lister for an amount sufficient to compensate them and the purported partnership for the losses that were incurred. The Copenhavers also asserted that Lister had converted certain proceeds from the business without authorization from the Copenhavers, and that Lister had made various fraudulent misrepresentations, including statements to Copenhaver that "they were partners in 'Lister Well Drilling' and would share equally in the profits." Appellant's App. p. 58. Finally, the Copenhavers made a claim against Lister for wages, unjust enrichment and constructive fraud.

Thereafter, in 2002, the trial court awarded Lister possession of the disputed business equipment during the pendency of the case conditioned "upon his posting of a [replevin] bond" and "maintain[ing] an accurate accounting" of income and expenses that had been generated through the use of the business equipment. At that time, the trial court found it "clear" that Copenhaver had "at least a claim to substantial equity in that equipment," and therefore "a right to a portion of the value of that property." Tr. p. 190.

Prior to trial, both parties requested special findings in accordance with Indiana Trial Rule 52. Following a three-day bench trial that commenced in August 2004, it was ultimately found that no part-

nership existed between the Copenhavers and Lister. Following its entry of 114 findings of fact and fourteen conclusions of law, the trial court determined that Lister was entitled to a judgment in the amount of $120,107.25, representing $23,505 "trebled or $70,515 plus attorney fees of $7500 for the wrongful conversion of the monies received from the use of Lister Well Drilling vehicles, machinery, tools and equipment," "$4,952.71 trebled or $14,858.13 plus attorney fees of $2500 for the wrongful conversion of the savings account . . . for his daughter Stephanie Lister and taken by Paul Copenhaver," and "$5,000 as attorneys fees occasioned by the contemptuous action of the Copenhavers in not returning to Steve Lister . . . the vehicles, machinery, tools and equipment to which he was entitled as a result of the replevin order." Appellant's App. p. 33.

Among the conclusions of law entered on April 5, 2005, the trial determined that:

1. Other than the incidental references to "draws" and a couple of references by Lister to his "partner" or "ex-partner" there is absolutely no evidence to support the conclusion that the parties formed a partnership. There is no written agreement. There is not sufficient evidence of intent of the partners to enter into a partnership agreement that such an agreement could be imputed based on the conduct of the parties. A partnership arises out of a contractual relationship and, absent a written agreement, the issue is whether the conduct of the parties creates a situation where equity requires the court to find a contract was created. In this case there is insufficient evidence for the Court to discern what the terms of any agreement might have been. Therefore, no partnership existed between Steve Lister and [the Copenhavers].

. Mike Copenhaver worked as an independent contractor for the Water Boys partnership and later for Steve Lister. Mike Copenhaver also acted as agent for Lister Well Drilling in west central Indiana. Mike Copenhaver was paid for all the work that he performed.

*Id.* at 32. The Copenhavers filed a motion to correct error on May 4, 2005, as well as a pro se ethics complaint against the trial judge who presided at trial. Thereafter, on June 8, 2005, the Copenhavers requested that a hearing be set on the motion to correct error. The following day, a hearing date was set for July 13, 2005.

The trial judge then voluntarily recused himself on June 29, 2005, because the Copenhavers had filed a complaint against him with the Indiana Commission on Judicial Qualifications. The order also directed that the hearing on the motion to correct error "should be continued without date subject to a special judge appearing, qualifying and assuming jurisdiction of the case and then setting the hearing on the Motion to Correct Errors." Appellant's App. p. 63. Thereafter, on July 13, 2005, the trial court issued an order appointing the special judge and requesting him to "qualify and assume jurisdiction." *Id.* at 64.

On August 2, 2005, the special judge who qualified in the case specifically ordered "[a]ll deadlines . . . vacated." *Id.* at 65. That same order set a "telephone Pre–Trial Conference" for August 19, 2005. Thereafter, in an order issued on August 24, 2005, it was determined that the "Court will decide whether to set a hearing" on the Motion to Correct Error. *Id.* at 15–16. Two days later, the trial court denied the motion to correct error. The Copenhavers then filed their Notice of Appeal on September 23, 2005.

## DISCUSSION AND DECISION

### I. Dismissal of Appeal

Before proceeding to the merits of this appeal, we first address Lister's claim that the appeal should be dismissed because the Copenhavers allegedly failed to file their Notice of Appeal in a timely manner. In essence, Lister claims that dismissal is warranted because the Copenhavers should have filed their Notice of Appeal by September 12, 2005. Because they did not, Lister argues that the Copenhavers are attempting to create an impermissible "exception to the time limitation for ruling on a motion to correct error that is not set out in Indiana Trial Rule 53." Cross–Appellant's Reply Br. p. 3.

In resolving this issue, we first set forth the relevant trial rules. Trial Rule 53.3(A) provides as follows:

In the event a court fails for forty-five (45) days to set a Motion to Correct Error for hearing, or fails to rule on a Motion to Correct Error within thirty (30) days after it was heard or forty-five (45) days after it was filed, if no hearing is required, the pending Motion to Correct Error shall be deemed denied. Any appeal shall be initiated by filing the notice of appeal under Appellate Rule 9(A) within thirty (30) days after the Motion to Correct Error is deemed denied.

Additionally, Trial Rule 53.3(D) states that

The Judge before whom a Motion to Correct Error is pending may extend the time limitation for ruling for a period of no more than thirty (30) days by filing an entry in the cause advising all parties of the extension. Such entry must be in writing, must be filed before the expiration of the initial time period for ruling set forth under Section(A), and must be served on all parties. Additional extension of time may be grant-

ed only upon application to the Supreme Court as set forth in Trial Rule 53.1(D).

In support of his argument that the appeal must be dismissed, Lister directs us to *Williamson v. Williamson*, 825 N.E.2d 33 (Ind.Ct.App.2005). In *Williamson*, the mother-appellee filed her motion to correct error in a timely manner, and the trial court complied with the requirements of Trial Rule 53.3 and set a hearing on the motion within forty-five days. This hearing was then continued pursuant to the father-appellant's request and once on the trial court's own motion. The hearing was ultimately set for September 16, 2002, but the mother's counsel had withdrawn from the case. Hence, on September 16, the trial court granted the mother an indefinite continuance to obtain replacement counsel. The trial court did not reset the hearing date within forty-five days of the September 16 continuance, and did not hold the hearing until March 31, 2004. The father never objected to the continuance.

On appeal, a divided panel of this court determined that the mother's motion to correct error was deemed denied pursuant to Trial Rule 53.3, forty-five days after September 16, 2002, because the trial court did not reset the hearing within forty-five days from September 16, 2002. (Baker, J. dissenting)[1]. Hence, when considering the rationale advanced in *Williamson* as it relates to the circumstances here, Lister maintains that the Copenhavers should have filed their Notice of Appeal on or before September 12, 2005, in order for it to have been timely. More specifically, Lister asserts that when the recusal order was entered on June 29, 2005, the motion to correct error was deemed denied on August 13, 2005, under Trial Rule 53.3 because no hearing had been scheduled on the motion within forty-five days from the date of the recusal order. And once the motion to correct error was deemed denied, the result in *Williamson* dictates that the Copenhavers were required to file their notice of appeal by September 12, 2005.

We note, however, that even if the rationale advanced in *Williamson* should dictate the result here, a split of authority appears to exist in our court regarding the application of Trial Rule 53.3. For instance, in *Kovacik v. Kovacik*, 631 N.E.2d 509 (Ind.Ct.App.1994), the appellee-wife filed a motion to correct error on August 19, 1992, which was set for hearing on September 10 or 11 of that year. The hearing did not occur, and in February 1993—five months later—the trial court reset the hearing at the wife's request and ultimately granted her motion. *Id.* at 510. In the end, we rejected the husband's argument that the motion had been deemed denied under Trial Rule 53.3. Moreover, while the *Kovacik* court focused on whether an initial setting of a hearing on a motion to correct error had to be completed within forty-five days, there was no determination as to whether a rescheduling beyond that date might be permissible.

On the other hand, in *Ostertag v. Ostertag*, 755 N.E.2d 686, 689 (Ind.Ct.App.2001), the record demonstrated that a motion to correct error had been set for hearing on June 20, 2000. However, it was not established whether a hearing actually occurred on that day. Additional motions were filed, and one hearing was conducted after the forty-five day window had closed, but the record was silent as to whether the motion to correct error was ever heard at

---

**1.** The author of this opinion observed in his dissent in *Williamson* that Trial Rule 53.3, among other things, does not establish a "bright-line" rule. *Williamson*, 825 N.E.2d at 48, Baker, J., dissenting.

the later hearing. *Id.* at 687. Again, a divided panel of this court determined that in light of the deficiencies in the record, the appellant had failed to sustain her burden "demonstrating that she timely filed her praecipe, and we [could not] infer our own jurisdiction on such a slender record." *Id.* at 687–88.[2]

■ Notwithstanding any uncertainty as to whether Trial Rule 53.3 operates to impose the same forty-five day requirement for rescheduling hearings as for initial settings, the circumstances here are distinguishable from those presented in *Williamson.* Specifically, our examination of the June 29, 2005, order reveals that the trial court did not intend to indefinitely continue the hearing on the motion to correct error without *any* hearing date. To the contrary, the plain language of the order directed the successor trial court judge to resume consideration of the motion to correct error and reset that motion for a hearing. In essence, the trial court was simply providing additional time for the special judge to qualify, become familiar with the case, fairly assess the merits of the motion, and conduct the hearing according to the availability of the court's calendar. Moreover, the special judge followed that directive in that he vacated all previously-set deadlines pending the telephonic status conference. *Id.* at 65. And the Copenhavers' motion to correct error was the only matter that remained before the court in which any deadline was pending. We also note that both of the orders were (1) in writing, (2) filed less than 45 days after the previous hearing had been continued, and (3) served on the parties. Therefore, those orders satisfied Trial Rule 53.3(D)'s requirements for extending

the deadline up to thirty days. Hence, the ruling on the merits of the motion issued on August 25, 2005, fell well within the new seventy-five day window created by those orders.

Given these circumstances, it is apparent that the continuance granted by the trial court in this case did not have the effect of just "sending the motion away" without any further action. As noted above, the order specifically directed the successor trial court judge to reset the matter for hearing. On the other hand, the trial court in *Williamson* merely continued the hearing without any date, and no further judicial action was contemplated. *See Williamson,* 825 N.E.2d at 47. As a result, we do not find an irreconcilable conflict between this case and the rationale set forth in either *Williamson* or *Ostertag,* and we cannot agree with the notion that a bright line rule regarding the application of Trial Rule 53.3 should control the outcome in circumstances such as these. In our view, Lister is simply attempting to elevate form over substance— a concept that we will not permit. That said, we conclude that the Copenhavers filed their notice of appeal in a timely fashion, and that the appeal is properly before us.

### II. Existence of Partnership

#### A. Standard of Review

■ We initially observe that when, as here, a party has requested specific findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. *Mitchell v. Mitchell,* 695 N.E.2d 920, 923 (Ind.1998). In reviewing the judgment, we first must

---

**2.** Judge Sullivan dissented on the theory that the requirements of Trial Rule 53.3(A) were satisfied once the hearing had initially been set within forty-five days, and that *"Kovacik* seems to allow for a seemingly indefinite period of time to elapse before a hearing on a motion to correct error need be rescheduled." *Id.* at 689.

determine whether the evidence supports the findings and second, whether the findings support the judgment. *Ahuja v. Lynco Ltd. Med. Research,* 675 N.E.2d 704, 707 (Ind.Ct.App.1996). The judgment will be reversed if it is clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.*

To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility. *Id.* And we will not reverse upon the basis of conflicting evidence. *Franks v. Franks,* 163 Ind.App. 346, 323 N.E.2d 678, 680 (1975). A judgment is clearly erroneous even though there is evidence to support it if our examination of the record leaves us with the firm conviction that a mistake has been made. *Owensby v. Lepper,* 666 N.E.2d 1251, 1256 (Ind.Ct.App.1996).

### B. The Copenhavers' Claims

The Copenhavers argue that the trial court erred in determining that no partnership existed between them and Lister. In essence, they urge that the trial court's findings were contradictory in light of the evidence that was presented at trial to the extent that the judgment must be reversed. Hence, the Copenhavers argue that they are entitled to a new trial.

Pursuant to Indiana Code section 23–4–1–6(1), a partnership is defined as "[a]n association of two or more persons to carry on as co-owners a business for profit and includes for all purposes of the laws of this state a limited liability partnership." A companion statute, Indiana Code section 23–4–1–7, sets forth the rules for determining whether a partnership exists:

(1) Except as provided by section 16 of this chapter, persons who are not part-

ners as to each other are not partners as to third persons.

(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.

(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that the person is a partner in the business, *but no such inference shall be drawn if such profits were received in payment for the following:*

(a) As a debt by installments or otherwise.

(b) *As wages of an employee or rent to a landlord.*

(c) As an annuity to a widow or representative of a deceased partner.

(d) As interest on a loan though the amount of payment varies with the profits of the business.

(e) As the consideration for the sale of a goodwill of a business or other property by installments or otherwise.

(Emphases added).

In construing these rules, this court has held that the existence of a partnership is generally a question of fact. *Weinig v. Weinig,* 674 N.E.2d 991, 994 (Ind.Ct.App.1996). The requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services, and having a community of interest in the profits.

*Id.* at 994–95. Additionally, to establish a partnership relation between parties, there must be: (1) a voluntary contract of association for the purpose of sharing profits and losses, which may arise from the use of capital, labor, or skill in a common enterprise; and (2) an intention on the part of the parties to form a partnership. *Id.* at 995. Further, the intention that controls in determining the existence of a relationship is the legal intention deducible from the acts of the parties. *Id.* The intention to form a partnership must be determined by examining all the facts of the case, and the conduct of the parties reveals their true intentions and the construction they placed upon their own agreement. *Id.*

Of the 114 findings of fact that were entered in this case, the Copenhavers attack the following three in support of their position that the trial court erred in determining that a partnership did not exist:

25. Because of the breakup of Waterboys with each of the principals taking a drilling rig, the plan to bring a rig to West Central Indiana never developed.

. . .

28. Lister made reference to Copenhaver twice as his partner or ex-partner: once to the insurance representative in the course of settlement of Lister's claim for the wreck of the Frank's rig, and once to a State of Indiana Conservation Officer investigating a complaint.

29. In April of 2001 as Lister Well Drilling began to be busier, Copenhaver and Lister each "took draws" or received pay of $500 per week. In June 2001, Lister wanted more than a 50–50 arrangement, he wanted to be paid for the use of the equipment. Copenhaver maintained he was a 50% owner of the equipment because of working on it, repairing and maintaining it. Copenhaver claimed he put money in the company to keep it going when no money was coming in and went without a paycheck when money was short. Copenhaver and Lister never reached any agreement beyond what each would "draw," and Lister continued to pay for the repairs and maintenance of the equipment or payment for repairs and maintenance came out of the Lister Well Drilling account. After a period of time they each took $600 per week in pay.

Appellant's App. p. 21–22. In essence, the Copenhavers argue that the evidence presented at trial contrary to the findings set forth above—but consistent with other findings—necessarily precluded the trial court's ultimate determination that no partnership existed. In particular, the Copenhavers point to the evidence and finding establishing that the drilling rig *was* brought to west central Indiana, and the evidence demonstrating that Copenhaver used the equipment in Montgomery County as the parties had planned in the event that Norris had remained involved in the business. Tr. p. 44. The Copenhavers also direct us to the trial court's determination that "Lister never acknowledged a partnership with Mike Copenhaver at anytime," Appellant's App. p. 31, whereas finding number twenty-eight quoted above establishes that Lister *did* refer to Copenhaver as a partner of the business.

Notwithstanding the Copenhavers' contentions, finding number twenty-five may very well be interpreted to indicate simply that the Waterboys partnership had planned to expand their business into different areas, but it did not occur because the partnership had disbanded. Moreover,

even though Lister may have taken a drilling rig from the Waterboys partnership at some point, that evidence does not necessarily rebut the proposition that Copenhaver was an independent contractor for Lister Well Drilling and was using the rig to perform work in west central Indiana. Hence, this particular finding can be read in harmony with the remaining findings that support the judgment, and we cannot say that it was clearly erroneous or inconsistent with the other findings to the extent that the judgment must be reversed.

Likewise, we decline to conclude that the remaining two findings that Copenhaver attacks necessarily support the existence of a partnership. As set forth above, before a judgment will be set aside, this court must find that the evidence does not support the special findings of fact and that those findings do not support the judgment. *Ahuja*, 675 N.E.2d at 707. And the findings will be deemed clearly erroneous if they are found not to support the judgment. *Id.* Here, it is apparent that the trial court evaluated findings twenty-eight and twenty-nine when it referred to their substance in Conclusion of Law Number One:

1. *Other than the incidental references to 'draws' and a couple of references by Lister to his 'partner' or 'ex-partner' there is absolutely no evidence to support the conclusion that the parties formed a partnership.* There is no written agreement. There is not sufficient evidence of intent of the partners to enter into a partnership agreement that such an agreement could be imputed based on the conduct of the parties. A partnership arises out of a contractual relationship and, absent a written agreement, the issue is whether the conduct of the parties creates a situation where equity requires the court to find a contract was created.

In this case, there is insufficient evidence for the Court to discern what the terms of any agreement might have been. Therefore, no partnership existed between Steve Lister and Mike Copenhaver or Paula Copenhaver.

Appellant's App. p. 32 (emphasis added).

■ Finally, even if it could be said that the findings were somewhat inconsistent, we cannot conclude that the isolated findings challenged by the Copenhavers were fatal to the ultimate issue of whether the parties had operated the business as a partnership. To be sure, the evidence presented at trial and the remaining findings established that the parties were unable to reach an agreement that otherwise might have permitted them to expand the business to other areas in Indiana. Moreover, the evidence at trial showed that the conduct of the parties during the course of their relationship was not sufficient to establish the existence of a partnership. In particular, the evidence established that Copenhaver worked for the Water Boys partnership and was paid a certain amount for the work and labor he expended at the Water Boys' request. Copenhaver was also paid for the expenses he incurred while performing the work. *Id.* at 20–21. Although Copenhaver took "draws" from the business on occasion, he and Lister never reached any agreement beyond the amount that each would "draw," and Lister either paid for the repairs and maintenance of the equipment himself, or the money for the repairs was generated from the Lister Well Drilling account. *Id.* at 22. Also, while Lister may have approached Copenhaver at one time about becoming a partner, no agreement was ever executed or prepared, and there was no transfer of titles of vehicles or equipment. No partnership tax returns were prepared, and the evidence failed to establish that there

was any change in the manner that business was conducted. *Id.* at 23.

When Paula Copenhaver began managing the books and financing of the business, she did not attempt to obtain a partnership identification number for the business. *Id.* At some point, Copenhaver wrecked the drilling rig, but he made no claim to the insurance proceeds. At that time, Copenhaver never asserted that he was a partner in the business or that he owned any part of the equipment. *Id.* at 24.

When considering this evidence and the findings, it is apparent to us that the relationship between Lister and Copenhaver fell short of "a voluntary contract of association for the purpose of sharing profits and losses," and that their actions during the course of their relationship were not reflective of an intent to form a partnership. *Weinig,* 674 N.E.2d at 994–95. That said, our review of all of the facts and circumstances supports the trial court's determination that no partnership existed between Lister and Copenhaver. As a result, we decline to set aside the judgment entered against the Copenhavers.

The judgment of the trial court is affirmed.

SULLIVAN, J., and MAY, J., concur.